<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Illinois, by Kwame Raoul, Illinois Attorney General v. Eli Lilly and Co., et al.* | |
| Case No. 2:23-cv-04242 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Evernorth Health, Inc.'s ("Evernorth") Motion to Dismiss[1]

Plaintiff the People of State of Illinois's (the "State") Complaint (Dkt. No. 2:23-cv-04242, ECF

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AG Track cases were directed to refile all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in the following State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Illinois Action: (1) co-defendants CVS Health Corporation's (ECF No. 190-33) and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF No. 190-35) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF No. 190-37) and PBM Defendants' (ECF No. 190-39) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Evernorth joined PBM Defendants' Rule 12(b)(6) motion to dismiss, which is addressed in a separate opinion. The following motions were filed in connection with the Montana Action: (1) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth (ECF No. 190-14), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-18), and CVS Health Corporation (ECF No. 190-16); and (2) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-1) and PBM Defendants (ECF No. 190-12). This Opinion only resolves Evernorth's Motion to Dismiss pursuant to Rule 12(b)(2). (ECF No. 190-30.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

No. 1, Ex. A)[2] pursuant to Federal Rule of Civil Procedure 12(b)(2) (the "Motion") (ECF Nos. 190-30, 190-31). The State filed an Opposition to Evernorth's Motion to Dismiss, arguing the Motion to Dismiss should be denied but that, in the alternative, the State is entitled to jurisdictional discovery (ECF No. 190-41), and Evernorth filed its Reply (ECF No. 190-47). Having reviewed and considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, the State's request for jurisdictional discovery is **GRANTED**, and Evernorth's Motion to Dismiss is **DENIED** with leave to refile at the conclusion of jurisdictional discovery.

**I.   BACKGROUND**

   **A.  Factual History[3]**

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

This action arises out of the State's challenge to Evernorth and Defendants'[4] allegedly unfair and unconscionable pricing scheme for their insulin medications (the "Insulin Pricing

---

[2] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-30, 190-31, 190-41, 190-47. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

[3] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[4] "Defendants" consist of Manufacturer Defendants and PBM Defendants. Manufacturer Defendants include defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (together, "Manufacturer Defendants"). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 5.) PBM Defendants include Evernorth Health Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and

Scheme"). (*See generally* Compl. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A).) The Attorney General of the State of Illinois, the Honorable Kwame Raoul, brings this action on behalf of the State of Illinois, under his authority to bring such actions to protect the health, safety, and welfare of the citizens of Illinois and to enforce the provisions of the Illinois Consumer Fraud Act ("ICFA"). (*Id*. ¶¶ 36, 37.) The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants. (*Id*. ¶¶ 5–6.) The State alleges "Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Illinois, which engaged in the activities that gave rise to this Complaint." (*Id*. ¶ 127.)

The State contends Manufacturer Defendants, who "manufacture the vast majority of insulins and other diabetic medications available in Illinois," worked "in tandem" to "artificially and willingly raise their list prices" of insulin medications, "and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendants]," in order to gain formulary preference. (*Id*. ¶¶ 5, 10, 15, 20.) The State claims that: "Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have persistently raised the prices of their respective diabetes drugs in a lockstep manner despite the fact that the cost to produce these drugs has decreased during that same time period." (*Id*. ¶ 13.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug

---

Medco Health Solutions (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Incorporated, OptumRx Inc., and OptumInsight, Inc. (together, "OptumRx") (together, with Express Scripts and CVS Caremark, "PBM Defendants"). (*Id*. ¶ 6.)

manufacturers.[5] (*Id.* ¶¶ 290–92.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id.* ¶¶ 281–83.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id.* ¶¶ 294–300.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[6] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id.* ¶ 283.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id.* ¶¶ 279–81.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to consumers with prescriptions. (*Id.* ¶¶ 281–84.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 286–87.) Upstream payments to the

---

[5] More specifically, PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 291.)

[6] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

4

manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates. (*Id.* ¶¶ 20–21.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 281.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 282.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their insured members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured consumers purchase a prescription medication from a pharmacy, both the consumer and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶¶ 296–300.) Manufacturers understand the PBM's formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id.* ¶¶ 21 n.3, 23, 344.) PBMs determine whether to pass along rebates to the health insurer, who in turn decides whether to share these cost-saving measures with consumers. (*Id.* ¶¶ 24–26.)

Here, the State alleges certain Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]"[7] to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id*. ¶¶ 376–98.) The State maintains these Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBM Defendants. (*Id*. ¶¶ 399–404.) The State further alleges that, while accepting these rebates from Manufacturer Defendants, PBM Defendants require customers using their own mail-order and retail pharmacies to pay these artificially inflated prices for insulin products, resulting in higher profits for PBM Defendants. (*Id*. ¶¶ 405–09.) The State asserts "Illinois diabetics and payors[8] relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id*. ¶ 412.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 415.)

According to the State, Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[9] by unjustifiably

---

[7] The State defines Manufacturer Payments as when "[t]he Manufacturers, knowing formulary position directly correlates to sales volume, simply raise their reported prices and then secretly kick back a significant portion of that price to the PBM Defendants." (ECF No. 190-41 at 3.)

[8] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

[9] The State asserts "PBM Defendants have taken over the market in the past decade—controlling over 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 310.)

raising the WAC for the insulin analog products so they could offer the middlemen-PBMs bloated rebates. (*Id.* ¶¶ 13, 20.) By raising the WACs, Manufacturer Defendants can increase the so-called "spreads" between list prices and net prices (the effective cost of the products for PBM Defendants after subtracting Manufacturer Defendants' rebates from the WAC), thereby increasing potential profits for PBM Defendants. (*Id.* ¶¶ 340, 345, 401–03.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id.* ¶¶ 299, 345 n.10.) The State contends Illinois diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because PBM Defendants' formularies are at the center of the allegedly unfair and unconscionable insulin pricing scheme. (*Id.* ¶¶ 335, 340.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id.* ¶¶ 313, 332.) PBM Defendants allegedly: (1) negotiate prices payors (*i.e.*, insurers) pay for prescription drugs; (2) separately negotiate a different (and often lower) price for in-network pharmacies; (3) set the amount in fees the pharmacy pays back to the PBM; (4) set the price paid for each drug sold through mail-order pharmacies; and (5) negotiate the amount manufacturers pay back to the PBMs via rebates. (*Id.* ¶ 298.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants strong leverage to extract rebates from manufacturers. (*Id.* ¶¶ 311, 378–80.) The State argues that, to secure preferred positions for their products on the formularies, Manufacturer Defendants offer PBM Defendants higher spreads by increasing the WACs and offering rebates, rather than lowering list prices for their prescription drugs. (*Id.* ¶¶ 399–401.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Illinois and at what prices." (*Id.*

¶ 297.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Illinois residents being "overcharged millions of dollars a year," which "caused a substantial injury to Illinois diabetics and the State." (*Id.* ¶¶ 29, 340, 490.)

### B. Procedural History

On December 2, 2022, the State filed a Complaint in the Circuit Court of Cook County, Illinois. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.) The matter was removed to the United States District Court for the Northern District of Illinois, Eastern Division, on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 1.) A supplemental notice of removal was also filed on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 7.) On March 6, 2023, Evernorth filed its Motion to Dismiss for lack of personal jurisdiction. (Dkt. No. 2:23-cv-04242, ECF Nos. 49, 50.) The State filed its Opposition on April 6, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 84.) Evernorth filed its Reply in support of its Motion on May 4, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 102.)

On May 9, 2023, prior to the District Court for the Northern District of Illinois deciding the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Kansas, Mississippi, and Montana, filed their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings before the United States Judicial Panel on Multidistrict Litigation ("JPML"). (Dkt. No. 2:23-cv-04242, ECF No. 105.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04242, ECF No. 110.) Pursuant to Case Management Order No. 7 (ECF

No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-30–31, 190-41, 190-47).

## II. LEGAL STANDARD

A plaintiff need not "alleg[e] personal jurisdiction in the complaint, but 'once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (quoting *Purdue Rsch. Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)).[10] In determining whether personal jurisdiction exists, the court must accept all well-pleaded allegations in the complaint as true. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

"When the court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction." *Shanghai Daisy, LLC v. PositivEnergy, Inc.*, Civ. A. No. 19-5901, 2020 WL 4365883, at *1 (N.D. Ill. July 30, 2020) (citing *Cent. States, Se. & Sw. Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877–78 (7th Cir. 2006)). The court may consider materials submitted outside of the pleadings when ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Purdue Rsch. Found.*, 338 F.3d at 783 ("[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise

---

[10] Because the parties originally filed suit in the Northern District of Illinois, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Seventh Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Seventh Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

of jurisdiction."). "[T]he plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Id*.

### III. DECISION

Evernorth argues that the State's Complaint should be dismissed as to Evernorth because it is neither subject to general nor specific personal jurisdiction in Illinois. (ECF No. 190-31 at 1.) Rather, Evernorth claims that it "is a holding company parent of the [PBM] Express Scripts, Inc. with no presence in Illinois." (*Id*.)

#### A. General Jurisdiction

Evernorth argues it is not subject to general jurisdiction in Illinois because it is not at home in Illinois since Evernorth is a Delaware corporation with its principal place of business in Missouri. (ECF No. 190-31 at 2–3 (citing Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 119).) The State does not dispute this, and clarifies it is not asserting Evernorth is subject to general jurisdiction in Illinois. (ECF No. 190-41 at 9 n.3.) Accordingly, this Court finds Evernorth is not subject to general jurisdiction in Illinois.

#### B. Specific Jurisdiction

Evernorth argues it is not subject to specific personal jurisdiction within Illinois because the State does not allege any Evernorth-specific contacts with Illinois. (ECF No. 190-31 at 3–6.) Evernorth maintains "the State does not allege that Evernorth purposefully directed any activities toward Illinois," as the State "does not allege that Evernorth has any offices in Illinois, entered into any contracts with the State, or even entered into any contract with any citizen of Illinois," or even "that Evernorth has a registered agent in Illinois." (*Id*. at 3 (citing Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 120).) Instead, Evernorth contends the State is advancing two "attenuated" theories of jurisdiction: "jurisdiction based on alleged downstream effects in Illinois and

10

jurisdiction based on imputed contacts of Evernorth's subsidiaries or affiliates." (*Id*. at 4.) According to Evernorth, both of these theories of jurisdiction fail. (*Id*. at 4–6.)

With regard to Evernorth's argument that the State is asserting there is jurisdiction over Evernorth "based on imputed contacts of Evernorth's subsidiaries or affiliates," the State outright rejects this theory, arguing its "allegations against Evernorth extend far beyond its role as a parent company and include its own direct involvement on formulating and executing the [Insulin Pricing] Scheme, and providing PBM services in furtherance of." (ECF No. 190-41 at 1.) Because Evernorth is not relying on this theory, the Court will not address it further.

Evernorth first addresses the State's theory based on Evernorth's participation in the alleged Insulin Pricing Scheme, which Evernorth argues occurred "outside of Illinois." (*Id*. at 4.) Evernorth claims that not only has the State failed to allege Evernorth has "minimum contacts" with Illinois, but also that the State "has failed to allege that Evernorth has any direct contacts with Illinois at all." (*Id*.) The State responds it has sufficiently alleged "Evernorth had suit-related contacts in Illinois," but, more importantly, Evernorth's "actions taken elsewhere were purposely directed at Illinois and had a foreseeable and intended effect in Illinois, thus subjecting it to jurisdiction there." (ECF No. 190-41 at 9–15.)

"Specific personal jurisdiction depends on 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022) (quoting *Bristol-Myers Squibb Co. v. Sup. Ct. of Ca.*, 582 U.S. 255, 262 (2017) (cleaned up)). A court has specific jurisdiction "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010); *see also*

11

*Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). The Seventh Circuit has summarized the three requirements for specific personal jurisdiction as follows:

> First, the defendant's contacts with the forum state must show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state. Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022) (citation omitted); *see also Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)). "If the plaintiff makes these three showings, he has established that the defendant 'purposefully directed' his activity at the forum state." *Felland*, 682 F.3d at 765.

For the Illinois long-arm statute to apply, *see* ILCS 5/2-209, it is insufficient for a plaintiff to "rely solely on a showing that the alleged harm was felt in Illinois"; rather, the plaintiff is additionally required to demonstrate defendants intended "to impinge upon an Illinois interest." *Hyperquest, Inc. v. NuGen I.T., Inc.*, 627 F. Supp. 2d 884, 894 (N.D. Ill. 2008). "[T]he mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 291 (2014); *see also Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018) ("Knowing about a potential for harm in a particular state is not the same as acting *in* that state—and it takes the latter to permit personal jurisdiction under state law."); *Green Light Nat'l, LLC v. Kent*, Civ. A. No. 17-6370, 2018 WL 4384298, at *3 (N.D. Ill. Sept. 14, 2018) ("It is not enough that a defendant know that any injury resulting from alleged tortious conduct would be felt in the forum state." (citation omitted)). "This means that the contacts must not be based on the unilateral actions of another

12

party and must be such that a defendant could reasonably anticipate being haled into court in Illinois." *Hyperquest*, 627 F. Supp. 2d at 894.

"In assessing the existence of specific jurisdiction, courts first determine whether the defendant's contacts with the forum state demonstrate that it 'purposefully availed' itself of the 'privilege of conducting business in the forum state' or 'purposefully directed' its activities at the state." *Alipourian-Frascogna v. Etihad Airways*, Civ. A. No. 21-0001, 2022 WL 847559, at *3 (N.D. Ill. Mar. 22, 2022) (citing *Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 878 (7th Cir. 2019); *Tamburo*, 601 F.3d at 702). Purposeful availment or purposeful direction requires: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

Here, the State argues Evernorth's conduct was expressly aimed at Illinois. (ECF No. 190-41 at 10–14.) In opposition to Evernorth's motion, the State asserts "Evernorth intentionally designed bids for PBM services to *Illinois* payors, sold those PBM services to *Illinois* payors, provided PBM services *to Illinoisans*, created formularies for use *in Illinois*, and dispensed the at-issue drugs *to Illinoisans in Illinois*." (*Id.* at 12.) However, in its Complaint, the State asserts "Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Illinois, which engaged in the activities that gave rise to this Complaint. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 127.) Indeed, the Complaint alleges it was "Express Scripts Administrators LLC [who] provided the PBM services in Illinois discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damages diabetics, the State, and payors in Illinois" during the relevant time period. (*Id.* ¶ 138.) Instead, "Evernorth, through its executives and

13

employees is directly involved in shaping the company policies that inform its PBM services and formulary construction . . . related to the Insulin Pricing Scheme." (*Id.* ¶ 121.)

Accordingly, the State appears to have only advanced an "impact theory of minimum contacts, which mistakenly assumes that because defendants' alleged tortious conduct would be felt in Illinois, the defendants *must have* acted with an intent to affect an Illinois interest." *See Hyperquest*, 627 F. Supp. 2d 884 at 894 (rejecting impact theory of minimum contacts because "it is too speculative to show the requisite intent on behalf of the Defendants to affect an Illinois interest" (citing *Morgan v. GTECH Corp.*, Civ. A. No. 90-238, 1990 WL 251900, at *5 (N.D. Ill. Dec. 19, 1990))). "[M]ere adverse effects on a corporation which is present within a state are not enough." *Young v. Colgate-Palmolive Co.*, 790 F.2d 567, 572 (7th Cir. 1986).

The State alleges Evernorth harmed Illinois by "shaping the company policies that inform its PBM services and formulary construction."[11] (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 121.) However, "[w]here the injury alleged is economic in nature, rather than physical or emotional, . . . the plaintiff needs to show more than the harm was felt in Illinois, the plaintiff must also show an intent to affect an Illinois interest." *Hyperquest*, 627 F. Supp. 2d at 891. The State

---

[11] The State further argues Evernorth's participation in the Pharmaceutical Care Management Association ("PCMA") gives rise to personal jurisdiction in Illinois. (ECF No. 190-41 at 11.) The State argues "[i]t alleges that the PCMA, under Evernorth's control, brought numerous lawsuits and lobbying campaigns to block drug pricing transparency efforts, and block rebate regulations that would impede the [Insulin Pricing] Scheme," contending these acts were "intentional and tortious." (*Id.*) However, the State cited no authority supporting the proposition that the acts of a trade association, through its one shared officer of a corporation, imputes jurisdiction onto that corporation. Further, the State makes clear that Evernorth did not have the "pervasive control" required to advance any alter-ego or agency theory of jurisdiction, as the State notes the PCMA Board of Directors is currently comprised of executives from Express Scripts, OptumRx, CVS Health, CVS Caremark, and potentially others. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 319.) *See Wilson v. Nouvag GmbH*, Civ. A. No. 15-11700, 2018 WL 1565602, at *6 (N.D. Ill. Mar. 30, 2018) ("The test for agency is 'whether the alleged principal has the right to control the agent, and whether the alleged agent can affect the legal relationships of the principal.'" (quoting *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998))).

does not plead any link between these activities and Illinois, beyond general assertions about the effect on Illinois itself. (*See id*. ¶ 122 ("Evernorth's conduct has had a direct effect on Illinois and damaged diabetics and payors in Illinois.").) This is not sufficient to demonstrate a *prima facie* basis for personal jurisdiction. *See Hyperquest*, 627 F. Supp. 2d at 895 ("[Plaintiff]'s bare assertion that the Defendants sought to affect an Illinois interest, without anything more, is insufficient to satisfy the tortious act provision of the Illinois long-arm statute, when the nonresident Defendant is alleged to have undertaken conduct that caused economic harm in Illinois.").

However, as discussed *infra* Section III.C, the Court notes the ambiguity surrounding the State's allegations regarding Evernorth's role in the Insulin Pricing Scheme (*compare* Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 121 (alleging Evernorth was "directly involved in shaping the company policies that inform its PBM services and formulary construction . . . related to the Insulin Pricing Scheme"), *with id*. ¶ 127 (alleging "Evernorth is the *immediate or indirect parent* of pharmacy and PBM subsidiaries that operate throughout Illinois*, which engaged in the activities that gave rise to this Complaint*" (emphasis added))). Because the State's allegations depend on the extent of Evernorth's participation in the Insulin Pricing Scheme, which information the State contends is in the sole possession of Evernorth, the State has stated a colorable basis for jurisdiction. (*See* ECF No. 190-41 at 17.) As the record is unclear, the Court proceeds to the State's request for jurisdictional discovery before deciding the Motion to Dismiss.

### C. Jurisdictional Discovery

In the alternative, the State asserts it is entitled to jurisdictional discovery regarding Evernorth's Illinois contacts, involvement in the Insulin Pricing Scheme, and corporate structure. (ECF No. 190-41 at 17–18.)

15

Courts have broad discretion to order jurisdictional discovery to ascertain whether personal jurisdiction exists over defendants. *Esquivel v. Airbus Ams., Inc.*, Civ. A. No. 20-7525, 2021 WL 4395815, at *1 (N.D. Ill. May 3, 2021). "To secure jurisdictional discovery, a plaintiff must, at a minimum, 'establish a colorable or *prima facie* showing of personal jurisdiction.'" *Gillam v. Abro Kalamazoo 3, Inc.*, 712 F. Supp. 3d 1079, 1082 (N.D. Ill. 2024) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Cup*, 230 F.3d 934, 946 (7th Cir. 2000)). Courts will typically grant such discovery if the plaintiff "can show that the factual record is at least ambiguous or unclear on the jurisdiction issue," but not if a plaintiff offers "bare, attenuated, or unsupported assertions of personal jurisdiction." *Gilman Opco LLC v. Lanman Oil Co., Inc.*, Civ. A. No. 13-7846, 2014 WL 1284499, at *6 (N.D. Ill. Mar. 28, 2024) (citations and internal quotation marks omitted); *see also Precision Dynamics Corp. v. Typenex Med., LLC*, Civ. A. No. 13-860, 2014 WL 12656904, at *2 (E.D. Wis. Feb. 13, 2014) ("Although the standard is low, a court should deny jurisdictional discovery when a plaintiff's request is only based upon bare, attenuated, or unsupported assertions of personal jurisdiction, or when a plaintiff's claim appears to be clearly frivolous."). "In ruling on a motion to take jurisdictional discovery, the Court accepts as true the factual allegations relevant to jurisdiction made in Plaintiff's complaint and draws all reasonable inferences in Plaintiff's favor." *Marks v. Worldwide Robotic Automated Parking, LLC*, Civ. A. No. 16-8656, 2017 WL 2985757, at *4 (N.D. Ill. July 13, 2017).

Here, the State contends it is seeking "any information that would further illuminate [Evernorth's] role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts Defendants." (ECF No. 190-41 at 17–18.) The Court agrees that jurisdictional discovery is warranted. There is an apparent dispute regarding the State's allegations concerning Evernorth's role in the Insulin Pricing Scheme (*see*

16

Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶ 121 (alleging Evernorth was "directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme")) and Evernorth's contention that it does not provide PBM services and that it is merely a holding company (ECF No. 190-46 at 1, 4).

Moreover, as asserted by the State in its request for jurisdictional discovery, "any information that would further illuminate [Evernorth's] role in the [Insulin Pricing] Scheme and the corporate relationship or lack of corporate separateness between Evernorth and the Express Scripts Defendants is in the sole possession of those Defendants." (ECF No. 190-40 at 17.) Therefore, the Court grants jurisdictional discovery to the State because the State has made at least a colorable showing that Evernorth and its related entities may be the alter ego of one another so that the actions of one entity may be imputed to another. *See Deckers Outdoor Corp. v. Wolverine Grp. Pty. Ltd.*, Civ. A. No. 24-3164, 2025 WL 1222471, at *3 (N.D. Ill. Apr. 28, 2025) (finding "targeted jurisdictional discovery is warranted to resolve ambiguities as to the corporate structures and operations of the defendants"); *see also Esquivel*, 2021 WL 4395815, at *2 (allowing jurisdictional discovery given existing ambiguity as to which entity was responsible for designing, manufacturing, and selling allegedly defective product).

Because the State's request for jurisdictional discovery may demonstrate facts sufficient to constitute a basis for jurisdiction, the Court grants the State's request to conduct jurisdictional discovery.[12] *See also Zurich Am. Ins. Co. v. Tangiers Int'l LLC*, Civ. A. No. 18-2115, 2018 WL 3770085, at *2 (N.D. Ill. Aug. 9, 2018) ("Generally, courts grant jurisdictional discovery if the

---

[12] Counsel are directed to meet and confer and submit to the Court a proposed order outlining the scope of jurisdictional discovery and all related deadlines within thirty (30) days.

plaintiff can show that the factual record is at least ambiguous or unclear on the jurisdiction issue." (quoting *Ticketreserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 782 (N.D. Ill. 2009))); *see also Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998 ("A plaintiff must make a threshold or *prima facie* showing with some competent evidence demonstrating that personal jurisdiction might exist over a defendant in order to be entitled to jurisdictional discovery.").

### IV. CONCLUSION

For the reasons set forth above, the State's request for jurisdictional discovery is **GRANTED**, and Evernorth's Motion to Dismiss (ECF Nos. 190-30–31, 190-47) pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED** with leave to refile at the conclusion of jurisdictional discovery. An appropriate Order follows.

Date: September 5, 2025                                  */s/ Brian R. Martinotti*
                                                         **HON. BRIAN R. MARTINOTTI**
                                                         **UNITED STATES DISTRICT JUDGE**