<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Illinois, by Kwame Raoul, Illinois Attorney General v. Eli Lilly and Co, et al.* Case No. 2:23-cv-04242 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss filed by Defendants Eli Lilly and Company's ("Eli Lilly"), Sanofi-Aventis US LLC's ("Sanofi"), and Novo Nordisk Inc.'s ("Novo Nordisk") (collectively, the "Manufacturer Defendants") Motion to Dismiss Plaintiff the People of State of Illinois's (the "State") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AGs were directed to refile, on the master docket, all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in these two State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Illinois Action: (1) co-defendants Evernorth Health, Inc.'s (ECF No. 190-31), CVS Health Corporation's (ECF No. 190-33) and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF No. 190-35) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF No. 190-37) and motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The following motions were filed in connection with the Montana Action: (1) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-14), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-18), and CVS Health Corporation (ECF No. 190-16); and (2) motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-1) and PBM Defendants (ECF No. 190-12). This Opinion only resolves Manufacturer Defendants' Motion to Dismiss pursuant

Nos. 190-36, 190-37.) The State filed an Opposition to Manufacturer Defendant's Motion to Dismiss (ECF No. 190-43), and Manufacturer Defendants filed their Reply (ECF No. 190-49). Having reviewed the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, Manufacturer Defendants' Motion to Dismiss is **DENIED**.

## I.    BACKGROUND

### A.    Factual History

For the purpose of this Motion to dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).[2]

This action arises out of the State's challenge to the Defendants'[3] allegedly unfair and unconscionable pricing scheme for their insulin medications. (*See generally* Compl. (Dkt. No.

---

to Rule 12(b)(6). (ECF No. 190-36.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

[2] Because the parties originally filed suit in the Northern District of Illinois, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Seventh Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Seventh Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

[3] "Defendants" refer to Manufacturer Defendants and PBM Defendants. (ECF No. 190-50 ¶ 213.) Manufacturer Defendants include defendants Eli Lilly, Novo Nordisk, and Sanofi ("Manufacturer Defendants"). (*Id*. ¶ 5.) PBM Defendants include Evernorth Health, Inc. (formerly known as Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc. (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx,

2:23-cv-04242, ECF No. 1, Ex. A).) The sole plaintiff in this member action is the State of Illinois, brought by the Honorable Kwame Raoul, Attorney General of the State of Illinois, who is authorized to bring such actions to protect the health, safety, and welfare of the citizens of Illinois and to enforce the provisions of the Illinois Consumer Fraud Act ("ICFA"). (*Id*. ¶¶ 36, 37.) The State generally categorizes each defendant into one of two groups: Manufacturer Defendants or PBM Defendants. (ECF 190-50 ¶¶ 5–6.) The State alleges that Manufacturer Defendants, who "manufacture the vast majority of insulins and other diabetic medications available in Illinois," worked "in tandem" to "artificially and willingly raise their list prices" of insulin medications, "and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendants]," in order to gain formulary preference. (*Id*. ¶¶ 5, 10, 15, 20.) The State alleges that: "Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme,[4] Manufacturer Defendants have persistently raised the prices of their respective diabetes drugs in a lockstep manner despite the fact that the cost to produce these drugs has decreased during that same time period." (*Id*. ¶ 13.)

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug

---

LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group, Inc., OptumRx Inc., and OptumInsight, Inc. (together, OptumRx") (together, with Express Scripts and CVS Caremark, "PBM Defendants"). (*Id*. ¶¶ 6, 76–213.)

[4] The State defines "Insulin Pricing Scheme" as "[t]he unfair and deceptive scheme at the root of [its] Complaint," wherein Manufacturer Defendants "artificially and willingly raise their list prices, and then pay a significant, yet undisclosed, portion of that price back to the PBM[ Defendant]s "to gain formulary access from the PBM Defendants for their diabetic treatments." (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 12, 20.) As the State explains: "PBM[ Defendant]s then grant preferred status on their standard formularies based upon the largest Manufacturer Payment and the highest inflated list price, which the PBM[ Defendant]s know to be artificially inflated and which the PBM[ Defendants] insist that their health plan payor clients use as the basis for the price they pay for the at-issue drugs." (*Id*. ¶ 22.)

manufacturers.[5] (*Id.* ¶¶ 290–92.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id.* ¶¶ 281–83.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id.* ¶¶ 294–300.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[6] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id.* ¶ 283.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id.* ¶¶ 279-81.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id.* ¶¶ 281–84.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 286–87.) Upstream payments to the

---

[5] More specifically, PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (ECF No. 190-50 ¶ 291.)

[6] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates. (*Id.* ¶¶ 20–21.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 281.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturer Defendants do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 282.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶¶ 296–300.) Manufacturer Defendants understand that the PBM's formularies drive drug utilization: "if Manufacturer[ Defendant]s want their drugs to be prescribed and paid for they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id.* ¶¶ 21 n.3, 23, 344.) PBMs determine whether to pass along rebates to the health insurer, who in turn decide whether to share these cost-saving measures with consumers. (*Id.* ¶¶ 24–26.)

Here, the State alleges certain Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]" to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id.* ¶¶ 376–98.) The State maintains these Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id.* ¶¶ 399–404.) The State further alleges that PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits for PBMs. (*Id.* ¶¶ 405–09.) The State asserts that "Illinois diabetics and payors[7] relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id.* ¶ 412.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id.* ¶ 415.)

According to the State, Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[8] by unjustifiably raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates—so-called "spreads" between list prices and net prices. (*Id.* ¶¶ 401–03.) "Net Prices" refers to the prices PBMs Defendants negotiate and pay for Manufacturer Defendants' products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued

---

[7] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

[8] The State asserts "PBM Defendants have taken over the market in the past decade—controlling over 80% of the market and managing pharmacy benefits for more than 270 million Americans." (ECF No. 190-50 ¶ 310.)

to them to gain formulary placement. (*Id*. ¶¶ 340, 345.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id*. ¶¶ 299, 345 n.10.) The State contends Illinois diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because of PBM Defendants' formularies are at the center of the allegedly unfair and unconscionable insulin pricing scheme. (*Id*. ¶¶ 335, 340.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id*. ¶¶ 313, 332.) PBM Defendants allegedly: (1) negotiate prices payors pay for prescription drugs, (2) separately negotiate a different (and often lower) price for in-network pharmacies, (3) set the amount in fees the pharmacy pays back to the PBM, (4) set the price paid for each drug sold through mail-order pharmacies, and (5) negotiate the amount manufacturers pay back to the PBMs. (*Id*. ¶ 298.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM Defendants wide latitude to extract rebates from manufacturers. (*Id*. ¶¶ 311, 378–80.) The State argues manufacturers offer PBM Defendants higher spreads in exchange for preferred positions on their drug formularies, rather than lower their list prices for their prescription drugs. (*Id*. ¶¶ 399–401.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Illinois and at what prices." (*Id*. ¶ 297.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Illinois residents being "overcharged millions of dollars a year," which "caused a substantial injury to Illinois diabetics and the State." (*Id*. ¶¶ 29, 340, 490.)

The State brings claims against Manufacturer Defendants for violation of the ICFA, 815 ILCS 505/1, *et seq*. (Count One) and for unjust enrichment (Count Two). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.)[9]

### B. Procedural History

On December 2, 2022, the State, through Attorney General Kwame Raoul, filed a Complaint in the Circuit Court of Cook County, Illinois. (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A.) The matter was removed to the United States District Court for the Northern District of Illinois, Eastern Division, on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 1.) A supplemental notice of removal was also filed on January 11, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 7.) On March 6, 2023, Manufacturer Defendants filed their Motion to Dismiss for failure to state a claim. (Dkt. No. 2:23-cv-04242, ECF Nos. 59, 60.) The State filed its Opposition on April 6, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 86.) Manufacturer Defendants filed their Reply in support of their Motion on May 4, 2023. (Dkt. No. 2:23-cv-04242, ECF No. 104.)[10]

On May 9, 2023, prior to the District Court for the Northern District of Illinois deciding the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Kansas, Mississippi, and Montana, filed their motion for transfer of actions pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings before the United States Judicial Panel on

---

[9] Concerning Count One, the State alleges Manufacturer "Defendants have committed unfair and deceptive acts and practices in the conduct of trade or commerce within Illinois with the intent that Illinois diabetics rely on them as prohibited by the [ICFA]"; and, specifically, Manufacturer "Defendants['] conduct in furtherance of the Insulin Pricing Scheme also violates Section 2 of the [ICFA] because it constitutes deceptive trade practices under the 'Uniform Deceptive Trade Practices Act' (815 ILCS 510/2) ("the IUDTPA"). (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A ¶¶ 486, 489.)

[10] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-36, 190-37, 190-43, 190-49. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

Multidistrict Litigation ("JPML"). (Dkt. No. 2:23-cv-04242, ECF No. 105.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04242, ECF No. 110.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-36–37, 190-43, 190-49).

## II.  LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court evaluating a Rule 12(b)(6) motion to dismiss must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded facts as true, and draw all reasonable inferences in the plaintiff's favor." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). However, the court "need not accept as true statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

### III.    DECISION

### A.  ICFA Safe Harbor Provision

Manufacturer Defendants argue the ICFA contains an express safe harbor, which bars the State's consumer fraud claim. (ECF No. 190-37 at 8–13.) Manufacturer Defendants assert that their reporting of the WAC falls under the safe harbor, which protects "actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." (*Id*. at 8–9.)  Manufacturer Defendants argue both that: (1) they accurately "report[ed] their list prices [a]s specifically authorized—and expressly prescribed—by federal law," and (2) manufacturer rebates are "authorized" by federal and Illinois law, as "the Illinois Legislature chose an entirely different policy solution to address the State's stated concerns about the affordability of Manufacturer[ Defendant]s' diabetes medications." (*Id*. at 9–11.)

The State counters that Manufacturer Defendants cannot rely on the Medicare WAC definition as a safe harbor because it is not a disclosure statute. (ECF No. 190-43 at 17–18.) Moreover, the State contends that Manufacturer Defendants' safe harbor argument "ignore[s] the principle that where a defendants engages in 'active and direct' conduct—such as here where the Manufacturer[ Defendant]s affirmatively reported and published false list prices—the defendant must demonstrate that the conduct was 'affirmatively and specifically authorized' by the 'relevant' regulatory body." (*Id*. at 18 (quoting *Toulon v. Cont'l Cas. Co.*, Civ A. No. 15-00138, 2015 WL 4932255, at *5 (N.D. Ill. Aug. 19, 2015), *aff'd*, 877 F.3d 725 (7th Cir. 2017)); *see also id.* at 19 ("In essence, the Manufacturer[ Defendant]s argue that, with respect to pricing, they are permitted to do whatever the law does not prohibit them from doing.").) Finally, the State posits that "the

Medicare WAC methodology is not relevant to actions which assert the Insulin Pricing Scheme." (*Id.* at 20–21.)

"An action for violation of the ICFA cannot be maintained for '[a]ctions or transactions specifically authorized by laws administrated by any regulatory body.'" *Raya v. Mead Johnson Nutrition Co.*, 758 F. Supp. 3d 819, 831 (N.D. Ill. 2024) (quoting 815 ILCS 505/10b(1)). "To trigger the safe harbor, the regulatory body must be operating within its statutory authority and the challenged conduct must be 'specifically authorized by laws administered by' that regulatory body." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019); *see Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir. 2001) ("If the parties are doing something *specifically authorized* by federal law, section 10b(1) will protect them from liability under the CFA. On the other hand, the CFA exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate."). "Formal rulemaking is not necessary; informal regulatory activity is enough." *Id.* at 736–37 (citation and internal quotation marks omitted).

42 U.S.C. § 1395w-3a(c)(6)(B) defines WAC as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price." As this Court has remarked before, "federal regulations do not specify how to calculate list prices; list prices are determined by the manufacturer." *In re Insulin Pricing Litig.*, Civ. A. No. 23-03080, 2024 WL 5252471, at *11 (D.N.J. Dec. 31, 2024); *see Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, Civ. A. No. 18-14999, 2020 WL 2394155, at *2 (D.N.J. Mar. 31, 2020) ("The approximate price at which a drug manufacturer sells a drug to a wholesale drug distributor is known as the [WAC]. This price is

generally set by the manufacturer[.]"); *see also MSP Recovery Claims, Series LLC v. Abbott Lab'ys*, Civ. A. No. 19-21607, 2021 WL 2177548, at *3 (D.N.J. May 28, 2021) ("The WAC is established by the manufacturer, generally does not include rebates, and is published in compendia compiled by independent third parties." (citations omitted)). As such, this Court cannot find that Manufacturer Defendants were acting as "specifically authorized" when calculating their list price, which is what the State claims Manufacturer Defendants artificially inflated as part of the Insulin Pricing Scheme. (*See* ECF No 190-50 ¶ 20 ("Manufacturer Defendants artificially and willingly raise their list prices, and then pay a significant, yet undisclosed, portion of that price back to the PBMs.); *id*. ¶ 21 ("The list prices for the at-issue drugs have become so untethered from the net prices realized by the Manufacturer[ Defendant]s as to constitute a false price."); *id*. ¶ 27 ("Because the price paid by nearly every diabetic and payor is based upon the artificially inflated list prices generated by Defendants' scheme, the insulin Pricing Scheme directly harms every diabetic and payor in Illinois who purchase these life-sustaining drugs."); *id*. ¶ 270 ("The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatment, they have done so in perfect lockstep."); *id*. ¶ 338 ("[T]he drug makers were aware that higher list prices meant higher revenue for PBMs.").

Moreover, this Court has rejected arguments similar to those made by Manufacturer Defendants in this litigation. In *In re Insulin Pricing Litigation*, this Court found that plaintiffs adequately pled mail and wire fraud where plaintiffs "allege[d] that Defendants committed fraud by '[holding] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug.'" Civ. A. No. 23-3080, 2019 WL 643709, at *5 (D.N.J. Feb. 15, 2019) (second alteration in original) (citation omitted). This Court noted "Plaintiffs further contend that the AWP had no reasonable relationship to the actual price

of the drugs, and that Defendants knew of this fraud." *Id*; *see also Minnesota by Ellison*, 2020 WL 2394155, at *14 (rejecting defendants' argument pointing to "the definition of WAC in the Federal Medicaid program . . . and argu[ing] it dispelled the deceptiveness of [defendants] non-Medicaid pricing misrepresentations" and denying defendants' motion to dismiss plaintiff's consumer protection claims) (second alteration in original) (internal citations and quotation marks omitted).

The court in *City of Miami v. Eli Lilly & Co.* also dealt with an analogous argument, where "[t]he [d]efendants argue[d] that federal law prohibit[ed] including rebates in a list price for pharmaceutical products." Civ. A. No. 21-22636, 2022 WL 198028, at *8 n.8 (S.D. Fla. Jan. 21, 2022). The court rejected the defendants' argument, holding that the "Manufacturer Defendants cannot use Section 1395w-3a(c)(6)(B) to avoid the City's allegations of wrongdoing," where "the City's claim is that the Manufacturer Defendants inflated the price of insulin and other medications through the use of fraudulent rebates that served as kickbacks to the PBM Defendants." *Id*.; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 199 (1st Cir. 2009) (affirming that the district court's factual findings were "justified," and "[t]he evidence supported a finding that AstraZeneca unfairly and deceptively published an artificial [AWP] for Zoladex that gave no indication of the actual, substantial discounts and rebates it was providing in the market. This conduct by [AstraZeneca] *was contrary to Congress's intent in designing the Medicare program*, and it clearly transgressed the expectations of the marketplace." (emphasis added)).

Indeed, this Court does not find that Manufacturer Defendants were acting as "specifically authorized" under the Medicaid statute. *See Vanzant*, 934 F.3d at 736. Congress has not specified how pharmaceutical manufacturers should set the list price or WAC, and thus, the Manufacturer Defendants cannot say that their reporting of the WAC was specifically authorized by Congress. *See In re Insulin Pricing Litig.*, 2024 WL 5252471, at *11. Moreover, "[c]onduct is not specifically

authorized merely because it has not been specifically prohibited." *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 36 (Ill. 2005)); *cf. Fed. Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 51–52 (Ill. App. Ct. 2009) ("[M]ere compliance with the rules applicable to labeling and advertising is not sufficient to trigger the exemption created by section 10b(1).") (quoting *Price*, 848 N.E.2d at 36); *Bojko v. Pierre Fabre USA Inc.*, Civ. A. No. 22-06728, 2023 WL 4204663, at *6 (N.D. Ill. June 27, 2023) ("The fact that federal law allows for the omission of benzene from the ingredients list does not 'implicitly provide[] specific authorization not to make any additional disclosures.'") (alteration in original) (quoting *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 43 (Ill. 2005)). Manufacturer Defendants' actions do not fall under the ICFA's safe harbor provision, and thus, Manufacturer Defendants' Motion to dismiss the State's ICFA claims pursuant to its safe harbor provision is **DENIED**.

## B. Illinois's Consumer Fraud Claim

### 1. Deceptive

Manufacturer Defendants argue this Court should dismiss the State's ICFA claims because the State has failed to allege that Manufacturer Defendants' list prices are deceptive. (ECF No. 190-37 at 13–18.) Manufacturer Defendants contend their list prices cannot be deceptive for four reasons: (1) the State "never alleges how a reasonable consumer plausibly could be misled by Manufacturer[ Defendant]s' list prices"; (2) it would be "contrary to settled Illinois law" to require Manufacturer Defendants to disclose more information regarding its list prices and profits; (3) the ICFA "does not require Manufacturer[ Defendant]s to say more about the relationship between rebates and list price because liability under [the ICFA] exists only when a defendant conceals a material fact of which is has 'almost exclusive knowledge'"; and (4) the State's deception claim "lacks the heightened specificity required by Rule 9(b)." (*Id.* (citation omitted).)

The State responds that it has sufficiently pled the elements of an ICFA deception claim, and that "[t]he only remaining question, which is an issue of fact for a jury, is whether the Manufacturer[ Defendant]s' list prices are deceptive." (ECF No. 190-43 at 6–9.) The State further retorts that the allegations of its Complaint "far surpass Rule 9(b)'s particularity standard." (*Id*. at 5.)

The ICFA prohibits:

> Unfair methods of competition and unfair or deceptive acts or practices, including . . . deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce[.]"

815 ILCS 505/2. To state a claim for deception under the ICFA, a plaintiff must allege: "(1) that the defendant engaged in a deceptive or unfair practice; (2) with the intent that the plaintiff (or others) rely on the deception; (3) that the act occurred in the course of trade or commerce; and (4) that the deception caused actual damages." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024). Under the ICFA, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober*, 246 F.3d at 938. To determine if deception has occurred under the ICFA, courts use a reasonable consumer standard, which requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Courts must consider the alleged false statements or omissions in the context of all information available to the plaintiff. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019). "Deceptive trade practice claims are generally not suitable for a motion to dismiss unless the challenged statement was not misleading as a matter of law." *Bruno v. Am. Textile Co., Inc.*, Civ.

A. No. 22-02937, 2023 WL 6976826, at *3 (N.D. Ill. Oct. 23, 2023) (citing *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 756 (N.D. Ill. 2015)).

For deceptive conduct claims, a plaintiff must meet Federal Rule of Civil Procedure 9(b)'s heightened standard. *Vanzant*, 934 F.3d at 738; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). To establish a claim under Rule 9(b), the plaintiff is required "to state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (quoting *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Put differently, the complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (internal quotations marks and citation omitted).

The State alleges Manufacturer Defendants engaged in deceptive trade practices by "report[ing] and publish[ing] artificially inflated prices for each at-issue drug and in doing so represent[ing] that the reported prices were reasonably related to the net prices for the at-issue drugs." (ECF No. 190-50 ¶ 489.) Further, the "Manufacturer Defendants caused the artificially inflated list prices . . . to be published throughout Illinois through publishing compendia and in various promotional and marketing materials distributed by entities downstream in the drug supply chain," (*id.* ¶ 416), "such as First DataBank, Redbook, and others who then publish that price" (*id.* ¶ 283). To be sure, the Complaint explains how the Insulin Pricing Scheme allegedly operated:

> Specifically, the Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their list prices, and then pay a significant, yet undisclosed, portion of that price back to the PBMs. These Manufacturer Payments . . . are provided under a variety of labels, yet, however they are described, these Manufacturer Payments, along with the inflated list

> prices, are quid pro quo for formulary inclusion on the PBMs'
> standard offerings.

(*Id*. ¶ 20.) The State alleges that these actions took place from 2003 through the present. (*Id.* ¶¶ 35, 261.) The Complaint goes as far as to identify the dates and rates of "key at-issue lockstep price increases" that the State alleges immediately followed private meetings between Manufacturer Defendants and PBM Defendants. (*Id.* ¶¶ 328–29.) All in all, the State has alleged with sufficient particularity the "who" (Manufacturer Defendants), "what" (Insulin Pricing Scheme), "when" (2003 to the present), "where" (publications such as First DataBank, Redbook, etc.), and "how" (artificially inflated prices and false and misleading statements regarding the artificially inflated prices) of the alleged deception. The Court concludes the State satisfied Rule 9(b)'s heightened pleading standard.

Further, the State has plausibly pled that Manufacturer Defendants' involvement in the Insulin Pricing Scheme is a deceptive act or practice within the meaning of the ICFA. "Courts considering whether consumers are 'acting reasonably' must 'take into account all the information available to consumers and the context in which that information is provided and used.'" *Kahn*, 107 F.4th at 595 (quoting *Publix*, 982 F.3d at 275, 477). There is nothing implausible about the State's allegations that Manufacturer Defendants concealed their artificially inflated list prices "to gain formulary access from the PBM Defendants," causing the State and others to unknowingly "pay a substantial part of their diabetic drug costs based on the false list prices generated by the Insulin Pricing Scheme." (ECF No. 190-50 ¶¶ 282, 285–88, 446, 452.)

Manufacturer Defendants contend "[n]o consumer could have plausibly been misled by Manufacturer[ Defendant]s' list prices, which Manufacturer[ Defendant]s said were the list prices, and that Manufacturer[ Defendant]s reported in a way that complied with the federal government's definition of list price." (ECF No. 190-37 at 14.) However, the State particularly alleges that

17

Manufacturer Defendants worked with PBM Defendants to "create[] a 'hide-the-ball' system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled."[11] (ECF No. 190-50 ¶ 380.) *See Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 911 (N.D. Ill. 2011) ("[T]he omission or concealment of material facts can constitute the 'deceptive act or practice' that causes 'actual damage to the plaintiff.'" (quoting 815 ILCS 505/2)); *see id.* ("[T]he ICFA applies to the omission of any material information in the conduct of trade or commerce[.]" (internal quotation marks omitted)). At this stage, the State has sufficiently pleaded that Manufacturer Defendants' statements regarding their list prices are false or misleading. *See Forth v. Walgreen Co.*, Civ. A. No. 17-02246, 2018 WL 1235015, at *6 (N.D. Ill. Mar. 9, 2018) (rejecting defendant's argument that "reliance on any misrepresentations would have been unreasonable, because information about the [prescription] prices was publicly available"); *Kirkbride v. Kroger Co.*, Civ. A. No. 21-00022, 2022 WL 2703960, at *4 (S.D. Oh. July 12, 2022) ("Plaintiffs' allegation that 'Kroger made misrepresentations to Plaintiffs and class members each time it charged them for copays that were calculated based on its inflated [usual and customary] prices is enough to ground a plausible theory of fraud by direct misrepresentation.").

Moreover, whether the State's reliance on Manufacturer Defendants' reported list prices "is a fact-intensive question inappropriate for resolution at this stage." *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 852 (N.D. Ill. 2021) (denying defendant's motion to dismiss wherein defendant argued plaintiff's reliance on their reported list prices was not reasonable because

---

[11] The Complaint further elaborates that "[a]s more payors moved to contracts that require PBMs to pass a majority of the manufacturer 'rebates' through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as 'rebates' are now called administrative fees, volume discounts, service fees, inflation fees or other industry jargon terms *designed to obfuscate and distract from the substantial sums being secretly exchanged.*" (ECF No. 190-50 ¶ 380 (emphasis added).)

plaintiff knew about an existing discount program and its prices and because "years of related litigation in their industry should have made [p]laintiffs aware of the alleged scheme"); *see Forth*, 2018 WL 1235015, at *6 ("[R]esolution of such a fact-intensive inquiry is not appropriate at the motion-to-dismiss stage."); *see Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 963 (N.D. Ill. 2024) (declining to grant defendants' motion to dismiss even though "[d]efendants may ultimately prove that the statements at issue are true, but at this stage in the case, [p]laintiffs have sufficiently alleged that the . . . statements may have misled a reasonable consumer"). Thus, the Moving Defendants' Motion to dismiss the State's ICFA claim based on deception is **DENIED**.

### 2. Unfair

Manufacturer Defendants contend the State failed to adequately allege any unfair conduct for three reasons: (1) the State failed to allege Manufacturer Defendants violated public policy; (2) the State has not sufficiently pleaded that Manufacturer Defendants' prices are "immoral, unethical, oppressive, or unscrupulous"; and (3) the State fails to allege a "substantial injury" to consumers. (ECF No. 190-37 at 18–22.) The State responds that it has sufficiently alleged unfair conduct pursuant to Illinois standards. (ECF No. 190-43 at 9–13.)

"A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "To determine whether a practice is unfair, Illinois courts consider three factors: whether it 'offends public policy'; is 'immoral, unethical, oppressive, or unscrupulous'; or 'causes substantial injury to consumers.'" *Vanzant*, 934 F.3d at 738–39 (quoting *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014)). "A court may find unfairness even if the claim does not satisfy all three criteria." *Siegel*, 612 F.3d at 935. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson v. Toyota Motor Credit Corp.*,

19

775 N.E.2d 951, 961 (Ill. 2002). "[W]hether a practice is unfair depends on a case-by-case analysis." *Siegel*, 612 F.3d at 935. "[A]n unfair-practices claim has no fraud element and therefore is not subject to a heightened pleading standard." *Vanzant*, 934 F.3d at 739.

### a. Public Policy

Manufacturer Defendants argue the State failed to allege that they violated public policy because the State has not sufficiently alleged which public policy Manufacturer Defendants violated, which is a particularly high bar for unfairness claims "predicated on supposedly high prices." (ECF No. 190-37 at 18–20.) Manufacturer Defendants contend the State's reference to Ill. Admin. Code tit. 14 § 470.250 should be discredited, as the section states it is an unfair or deceptive act to claim actual savings from a list price, which Manufacturer Defendants maintain they did not "claim any fake 'savings' from their list prices." (*Id*. at 19.)

To state a claim under the ICFA, "the plaintiffs must describe how the [unfair practice] is oppressive or violates public policy." *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 65 (Ill. 2006). "A practice offends public policy if it violates a standard of conduct embodied in a statute, the common law, or otherwise, *i.e*., if 'it is within at least the penumbra of some common-law, statutory or other established concept of unfairness.'" *Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 940–41 (7th Cir. 2021) (*Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1316 (1990)). "[D]efendant's conduct must violate public policy, be so oppressive as to leave the consumer with little alternative except to submit to it, and injure the consumer." *Robinson*, 775 N.E.2d at 961 (citing *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996)).

"Charging unconscionably high prices is not, by itself, unfair within the meaning of the [ICFA]." *Rockford Mem'l Hosp.*, 858 N.E.2d at 65 "Where it is alleged that the failure to disclose

prices is unfair, the plaintiffs must describe how the lack of disclosure is oppressive or violates public policy. Without such a description, the complaint fails to state a cause of action." *Id.* (citing *Robinson*, 775 N.E.2d at 951; *Saunders*, 662 N.E.2d at 602).

Here, the State alleges that Manufacturer Defendants' participation in the Insulin Pricing Scheme violates public policy in multiple ways, including: (1) "[i]t is a public policy in Illinois that diabetics and their families should have access to and not be priced out of the at-issue life-saving medications," and (2) "it is also against Illinois public policy to claim an actual savings from a list price or term of similar meaning unless the 'list price' is the price at which the product is offered by a reasonable number of sellers." (ECF No. 190-50 ¶ 491 (citing ILL. ADMIN. CODE tit. 14, § 470.250).) The State argues the January 2021 Illinois General Assembly's Act caps out-of-pocket insulin costs for insured Illinois consumers "confirms that public policy supports ensuring that consumers must have affordable access to insulin." (ECF No. 190-43 at 11 (citing ECF No. 190-50 ¶ 354).) The State further contends the FTC Act bars fictitious pricing as a "deceptive practice." (*Id.* (quoting *Spiegel, Inc. v. F.T.C.*, 411 F.2d 481, 483 (7th Cir. 1969).)

Manufacturer Defendants respond that the State's first cited public policy is a mere recitation of the "[I]CFA's bar on deceptive conduct." (ECF No. 190-49 at 8.) They assert both that this does not support a separate claim for unfairness and that "[t]his 'unfairness' claim collapses with the [State's] deception claim." (*Id.* at 8–9.) Manufacturer Defendants further take issue with the State's second proposed public policy (forbidding "'charging an unconscionably disproportionate price for little or no services'") because "there is no dispute that Manufacturer[Defendant]s *do* provide insulin, a valuable good." (*Id.* at 9 (quoting ECF No. 190-43 at 11).) The third public policy cited by the State (regarding Illinois's cap on out-of-pocket insulin costs for insured consumers) does not apply, as Manufacturer Defendants point out the Illinois "Legislature

did *not* regulate Manufacturer[ Defendant]s or their prices, but rather imposed price-controls on *insurers*." (*Id.*)

The Court finds the State has sufficiently pled Manufacturer Defendants' conduct violated public policy. While Manufacturer Defendants are correct that the State's third-cited public policy does not regulate manufacturers or their prices, this does not negate the underlying public policy of the statute. *See* 215 ILCS 5/356z.41 (capping insurer's price of a 30-day supply of covered prescription insulin drugs pursuant to the terms of a health coverage plan to $100). Moreover, the State has pled "[d]iabetes if an epidemic and a public health crises in Illinois[,]" with approximately 13% of its population have been diagnosed with diabetes and "[a]n additional 3.6 million Illinois residents have prediabetes[.]" (ECF No. 190-50 ¶ 1.) The State further alleges "[d]iabetes is the leading cause of blindness, kidney failure, and lower limb amputation and is the seventh leading cause of death in Illinois despite the availability of effective treatment." (*Id.* ¶ 2.) The State contends Manufacturer Defendants' participation in the Insulin Pricing Scheme have caused the cost of diabetes medication to skyrocket, leaving Illinois diabetes feeling "the physical, emotional, and financial tolls of paying such excessive prices." (*Id.* ¶ 28–30.) Moreover,

> In addition to the immeasurable human costs, the Insulin Pricing Scheme also adds substantial cost to the Illinois health care system by increasing preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

(*Id.* ¶ 31.) Because of the increased price of insulin allegedly due to the Insulin Pricing Scheme, "many diabetics in Illinois have begun to engage in highly risky behaviors with respect to their disease," such as rationing insulin, skipping refills, using expired insulin, reusing needles, and

skipping doctors' visits. (*Id.* ¶ 464.) Based on the State's allegations, it is apparent to this Court that these allegations assert Manufacturer Defendants actions were "within at least the penumbra of some . . . other established concept of unfairness." *See Leszanczuk*, 21 F.4th at 940–41.

### b. Immoral, Unethical, Oppressive or Unscrupulous

Manufacturer Defendants further contend the State has failed to plead that Manufacturer Defendants' insulin prices were "immoral, unethical, oppressive, or unscrupulous." (ECF No. 190-37 at 20.) They contend "Illinois courts have affirmed plaintiffs cannot premise a claim on high prices even where defendants are hospitals, health insurers, medical suppliers, and the like." (*Id.* at 20–21.) Manufacturer Defendants further assert the State has not plead sufficient facts to "support its claim that people with diabetes have no choice about the prices they pay." (*Id.* at 21.) The State generally agrees that "an unconscionably high price, standing alone, is insufficient to state an unfairness claim," but contends it "alleges facts sufficient to establish that the Manufacturer[ Defendant]s' conduct was immoral, unethical, and oppressive," as insulin is a "necessary part of life," which diabetics require "to 'survive' and avoid serious medical complications such as kidney failures and limb amputation." (ECF No. 190-43 at 10–13.) The State further notes "there is no source for insulin other than the Manufacturer[]" Defendants, who "produce 99% of the insulins sold in the U.S. Market." (*Id.* at 12.)

"[C]harging an unconscionably high price generally is insufficient to establish a claim for unfairness." *Robinson*, 775 N.E.2d at 951 (citing *Saunders*, 662 N.E. 2d at 608). "Seeking a profit is not inherently immoral, unethical, unscrupulous or oppressive; it is the essence of our free-market economy." *EBCF Enters., Inc. v. Erie Ins. Exchange*, 572 F. Supp. 3d 489, 498 (N.D. Ill. 2021); *see Flores*, 426 F. Supp. 3d at 531 ("There is nothing immoral, oppressive, unscrupulous

or unethical about charging a consumer a price she is willing to pay."). "That profit motive is not unethical, immoral or unscrupulous." *Id.*

However, "a practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2016) (citation omitted); *see Leszanczuk*, 21 F.4th at 943 ("Conduct is oppressive under the ICFA if it 'leave[s] the consumer with little alternative except to submit to it.'" (alteration in original) (quoting *Robinson*, 775 N.E.2d at 943); *cf. Flores v. United Airlines*, 426 F. Supp. 3d 520, 531 (N.D. Ill. 2019) ("Offering a choice to a potential customer is not immoral, unethical, oppressive or unscrupulous, which is to say offering a choice is not unfair for purposes of the ICFA."). "The rationale for that principle is that, unless there is some allegation of 'oppressiveness and lack of meaningful choice,' the plaintiff 'could have gone elsewhere' to purchase the good or service in question if the defendant charged an unfairly high price." *G.O.A.T. Climb & Cryo, LLC v. Twin City Fire Ins. Co.*, 548 F. Supp. 3d 688, 700 (N.D. Ill. 2021) (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 610 (7th Cir. 2013)).

Here, it is hard to see how the alleged exploitation of Illinois diabetics who require this life-saving insulin medication and have little to no choice but to purchase insulin from Manufacturer Defendants would not be considered immoral, unethical, oppressive, or unscrupulous. The State noted the importance of insulin to Illinois diabetics, stating:

> Insulin treatments are a necessary part of life for those who have diabetes[,] and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to a loss of consciousness and death within days.

(ECF No. 190-50 ¶ 223.)[12] As alleged in the State's Complaint as well as its opposition papers, diabetics require insulin to prevent medical complications, such as kidney failures and limb amputations, as well as death. (*Id*.; *Id*. ¶¶ 2, 4, 213; ECF No. 190-43 at 12.) *See Eike v. Allergan, Inc.*, Civ. A. No. 12-1141, 2015 WL 603196, at *3 (S.D. Ill. Feb. 12, 2025) (finding defendant's practice immoral, unethical, oppressive or unscrupulous because "[p]laintiffs cannot simply forego a prescribed medication"). Moreover, the State has adequately alleged that Illinois diabetics lack a meaningful choice in purchasing insulin from Manufacturer Defendants, as the State alleges "Manufacturer Defendants make 99% of the insulins on the market today." (ECF No. 190-50 ¶ 241.)[13] Because the State has alleged diabetics had no choice but to purchase Manufacturer Defendants' insulin or face the threat of serious injury and/or death, the State has sufficiently alleged that Manufacturer Defendants' conduct throughout the Insulin Pricing Scheme was immoral, unethical, oppressive, and unscrupulous. *Cf. Lane v. Direct Energy Servs., LLC*, Civ. A. No. 19-00674, 2020 WL 3211435, at *4 (S.D. Ill. June 15, 2020) (dismissing plaintiffs' unfair conduct ICFA claims for price-gouging against an energy company because plaintiff had the option to cancel its contract and choose a different energy supplier); *Sevugan v. Direct Energy Servs., LLC*, Civ. A. No. 17-06569, 2018 WL 2267806, at *7 (N.D. Ill. May 17, 2018) (same) ("Because [plaintiff] had alternatives and could have reasonably avoided paying the variable rates,

---

[12] (*See also* ECF No. 190-50 ¶ 262 ("By 2016, the average price per month of the four most popular types of insulin rose to $450 – and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.").)

[13] (See ECF No. 190-50 ¶ 453 ("To make matters worse, Illinois diabetics *have no choice but to pay* based on Defendants' artificially inflated list prices because they *need these medications to survive*, the Manufacturer Defendants *make virtually all of the diabetes medications available in Illinois*, and the PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in the market." (emphasis added).)

he fails to allege unfair conduct."); *Siegel*, 612 F.3d at 937 (affirming dismissal of plaintiff's unfairness claims despite defendant charging high gas prices because plaintiff cannot state a claim under the ICFA "absent proof that but for the defendants' conduct, he would not have purchased the defendants' gasoline").[14]

### c. Substantial Injury

Manufacturer Defendants lastly argue the State fails to allege a substantial injury to consumers because it "never alleges that its injuries are not outweighed by any 'countervailing benefits.'" (ECF No. 190-37 at 21–22.) Rather, Manufacturer Defendants contend their alleged conduct has a substantial "countervailing benefit," by "ensuring that Manufacturer[ Defendant]s' medications are placed on the PBMs' formularies, which in turn ensures that patients have affordable access to those medications." (*Id.* at 22.) The State retorts that "[t]o the extent that the Manufacturer[ Defendant]s argue inflated list prices allow them to 'make a market' for insulin, it is a market dominated by the Manufacturer Defendants in which consumers cannot afford and product and thus this argument should be soundly rejected." (ECF No. 190-43 at 13.) The State further asserts Manufacturer Defendants lack standing to address the alleged benefits of their

---

[14] Manufacturer Defendants rely on *Galvan v. Nw. Mem'l Hosp.*, 888 N.E.2d 529 (Ill. App. Ct. 2008), to support their assertion that Illinois courts have "rejected Consumer Fraud Act unfairness claims based on the assertion that an uninsured plaintiff 'had no choice but to accept the medical services provided to him at [] inflated rates' relative to the prices insured patients pay." (ECF No. 190-37 at 21 (alteration in original) (quoting *Galvan*, 888 N.E.2d at 538–39).) However, in that case, the court placed great significance on the hospital's "legitimate reason for charging uninsured patients more than it charges insured patients," because the hospital "knows it will be paid promptly for the services it provided" to insured patients and because the hospital could "legitimately expect insured members to use its services." *Galvan*, 888 N.E.2d at 538. The court further relied on the hospital's argument that "the plaintiff's oppressiveness argument is unpersuasive because the plaintiff did not and cannot allege he was required to pay anything as a condition of [the hospital] treating him." *Id.* This is starkly different than the allegations here that diabetics cannot receive their life-saving insulin prescriptions until they make a payment when they fill their prescriptions. (*See* ECF No. 190-50 at 286–89.)

Manufacturer Payments because of "their admission that they lack visibility into how PBMs actually use these payments," as "[t]here is substantial evidence that these Payments are not being used for their intended purpose." (*Id*.)

"A practice causes substantial injury under the ICFA 'if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers.'" *Dolemba*, 213 F. Supp. 3d at 998 (quoting *Mussat*, 2014 WL 3610991, at *3); *see Philips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016) ("A practice causes substantial injury 'if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided.'" (quoting *Batson v. Live Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014))). "Costs that are imposed on an unwilling consumer can constitute a substantial injury. . . . Even very small individual harms can be considered substantial, if they are part of a practice that, in the aggregate, causes substantial losses to the public as a whole." *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008) (internal citations omitted)).

Manufacturer Defendants contend their actions resulted in countervailing benefits, including "keeping a business competitive" and "maintaining consumer access to products." (ECF No. 190-37 at 21 (cleaned up).) However, it is apparent to the Court that any supposed "countervailing benefits" have been negated by the alleged Insulin Pricing Scheme. The State has sufficiently alleged that Manufacturer Defendants' actions and corroboration with PBMs ensured that the market for insulin remained noncompetitive. (*See* ECF No. 190-50 ¶ 241 ("[D]ue in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today."); *id*. ¶¶ 271–72 ("In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk raised the list prices of their insulins . . . in tandem, taking the same price increase

down to the decimal point within a few days of each other. This practice of increasing drug prices in lockstep with competitors is known as 'shadow pricing,' and, as healthcare expert Richard Evans from SSR Health recently stated, 'is pretty much a clear signal that your competitors does not intend to price-compete with you.'"); *id.* ¶ 419 ("Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to the net price they received for the at-issue drugs and were not based on transparent or competitive factors such as the cost of production or research and development.").) Significantly, the State alleges that this lack of competition actually hurt the consumer, as Manufacturer Defendants' anticompetitive behavior both hindered any further research and development and drove up prices for consumers. (*See id.* ¶ 354 ("A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs." (alterations in original))

Further, the State explicitly alleges that Manufacturer Defendants' involvement in the Insulin Pricing Scheme made insulin less affordable and thus less available to diabetics who need this medication. The State specifically alleges that "[t]here is substantial evidence that [the Manufacturer] Payments [we]re not being used for their intended purpose." (ECF No. 190-43 at 13 (citing ECF No. 190-50 ¶ 360 ("I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other partes of the healthcare system and *not to lower prices to the patient*." (emphasis added))).) Rather, the State alleges Manufacturer Defendants used their positions to ensure consumers had no choice but to pay exorbitant prices for a medically required drug. (*See* ECF No. 190-50 ¶ 262 ("By 2016, the average price per month of the four most popular types of insulin rose to $450 – and costs continue to rise, so much so that

now one in four diabetics are skimping on or skipping lifesaving doses."); *id.* ¶ 444 ("Contrary to their representations that they work to promote the health of diabetics *as a result of the Insulin Pricing Scheme many diabetics have been priced out of these life-sustaining medications*. As a result, many of these diabetics are forced to either ration their insulin or skip doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death." (emphasis added)); *id.* ¶ 464 ("Unable to afford Defendants' price increases, many diabetics in Illinois have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits."); *id.* ¶ 479 ("Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without.")

Construing the State's allegations in the light most favorable to the State, the Court finds that there is a substantial injury to consumers by stifling competition, raising prices, and making insulin more unavailable to consumers, causing them to turn to alternative and dangerous measures. (*See generally* 190-50 ¶¶ 241, 262, 271–72, 354, 444, 464.)

Because this Court finds the State has sufficiently stated a claim for unfairness under the ICFA, Manufacturer Defendants' Motion to dismiss the State's unfairness claim is **DENIED**.

### C.  The State's Unjust Enrichment Claim

Manufacturer Defendants argue the State's unjust enrichment claim should be dismissed because it is derivative of the State's ICFA claim, which Manufacturer Defendants assert should be dismissed. (ECF No. 190-37 at 22–23.) They further contend the State's unjust enrichment claim fails on the merits for two reasons: (1) the State cannot bring an unjust enrichment claim

when it admits it has contracts with some PBM Defendants, and (2) "nothing in the Complaint alleges that any Manufacturer received any benefit from Illinois or Illinois consumers, must less unjustly." (*Id.* at 23–25.) The State responds that: (1) it has adequately stated a claim under the ICFA, (2) its ICFA claim is not barred by any relevant contract because Manufacturer Defendants "admit they have no contractual relationships with Illinois consumers," and (3) "the [C]omplaint sufficiently alleges that benefits were conferred upon the Manufacturer[ Defendant]s." (ECF No. 190-43 at 22–24.)

"Under Illinois law, unjust enrichment is not a separate cause of action. Rather, it's a condition brought about by fraud or other unlawful conduct." *Vanzant*, 934 F.3d at 740 (internal citations and quotations marks omitted); *see also Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). "Unjust enrichment does not stand on its own. Instead, unjust enrichment stands on the shoulders of some other claim." *Barrientos v. Fitness Member Servs., LLC*, 749 F. Supp. 3d 944, 959 (N.D. Ill. 2024); *see Vanzant*, 934 F.3d at 740 (holding under Illinois law, unjust enrichment is a "request for relief" that is "tied to the fate" of an independent cause of action). "So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim." *Cleary*, 656 F.3d at 511.

Because this Court has determined that the State's ICFA survives dismissal, the unjust enrichment claim also survives. *See Biffar v. Pinnacle Foods Grp., LLC*, Civ. A. No. 16-00873, 2016 WL 7429130, at *6 (S.D. Ill. Dec. 22, 2016); *Kahn*, 107 F.4th at 606–07 ("Because plaintiff adequately pled the elements of a deceptive and unfair practice and intent to deceive under both the ICFA and the UDPTA, we also reinstate [plaintiff's] unjust enrichment claim."); *Sanchez v.*

*Walmart Inc.*, 733 F. Supp. 3d 653, 673 (N.D. Ill. 2024) ("Because plaintiff's ICFA claim survives, the request for restitution based on unjust enrichment survives as well.").

Manufacturer Defendants also argue that the State's unjust enrichment claim also fails because the State does not allege the required elements. "To state a cause of action for unjust enrichment, a plaintiff must establish: '(1) the defendant has unjustly retained a benefit to the plaintiff's detriment, and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 634–35 (N.D. Ill. 2016) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672 (1989)).

"Unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results." *Barrientos*, 749 F. Supp. 3d at 959 (quoting *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 622 (N.D. Ill. 2008)). "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004). "The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Id*. at 689. "An unjust enrichment claim may survive a motion to dismiss when the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 887 (7th Cir. 2022).

However, as Manufacturer Defendants concede, the contract(s) at issue are between the State and PBM Defendants.[15] (ECF No. 190-37 at 23.) Because Manufacturer Defendants were not a party to the relevant contract(s), and there was no express contract *between the State and Manufacturer Defendants* regarding the same subject matter, the State's claims fall outside the contract. *See RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, Civ. A. No. 09-04523, 2010 WL 3307084, at *3 (N.D. Ill. Aug. 18, 2010) (collecting cases and explaining that, where a contract governs the relationship between two parties, Illinois law does not preclude recovery for unjust enrichment against a third party); *Greenpoint Mortg. Funding Inc. v. Family First Mortg., Inc.*, Civ. A. No. 05-04498, 2007 WL 2608554, at *3 (N.D. Ill. Sept. 4, 2007) ("Absent any alleged contractual relationship between [plaintiff] and [defendant], [defendant] is not entitled to dismissal of [plaintiff's] unjust enrichment claims." (citations omitted)); *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) ("Because unjust enrichment is based on an implied contract, 'where there is a specific contract *which governs the relationship of the parties*, the doctrine of unjust enrichment has no application.'" (emphasis added) (quoting *La Throp v. Bell Fed. Sav. & Loan Ass'n*, 370 N.E.2d 188, 195 (Ill. 1977)); *Cohen*, 735 F.3d at 615 ("[R]ecovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract *between the plaintiff and defendant*." (emphasis added)). Because there is no express contract between the State and Manufacturer Defendants, the State is not precluded from bringing an unjust enrichment claim against Manufacturer Defendants.

---

[15] Manufacturer Defendants subsequently argue the State has not stated a claim for unjust enrichment because it has not demonstrated Manufacturer Defendants have unjustly retained a benefit from the State, and the State "cannot rely on fees or payments made by *other parties* (like drug wholesalers) to Manufacturer[ Defendant]s." (ECF No. 190-37 at 24.) In bringing this argument, Manufacturer Defendants assert: "Manufacturer[ Defendant]s do not have any relationship or interaction with Illinois, health plans, or any individual consumers," further confirming that the State's allegations fall outside of any contract. (*Id.*)

Manufacturer Defendants further argue the State's unjust enrichment claim must be dismissed because "nothing in the Complaint alleges that any Manufacturer received any benefit from Illinois or Illinois consumers, much less unjustly." (ECF No. 190-37 at 24–25.) Manufacturer Defendants contend the State cannot rely on benefits conferred to third parties—PBM Defendants—to establish its claim for unjust enrichment. The State responds that it has sufficiently alleged benefits were conferred upon Manufacturer Defendants, who retained more revenue from sales as a result of the Insulin Pricing Scheme than it did in the early 2000s, prior to the inauguration of the Insulin Pricing Scheme. (ECF No. 190-43 at 23–24.)

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs.*, 545 N.E.2d at 678. However:

> [A] plaintiff may pursue a cause of action for unjust enrichment where the benefit was transferred to the defendant by a third party where (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Apollo Real Est. Inv. Fund, IV, L.P. v. Gelber*, 935 N.E.2d 949, 962 (Ill. 2009); *see HPI Health Care Servs.*, 545 N.E.2d at 679. "[U]njust enrichment does not seek to compensate a plaintiff for loss or damages suffered but seeks to disgorge a benefit that the defendant unjustly retains." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (citation omitted).

Here, the State contends it has sufficiently stated that Manufacturer Defendants retained benefits "which flowed from the purchase of insulin and diabetes medications by Illinois consumers." (ECF No. 190-43 at 23–24.) The State asserts it has satisfactorily alleged that

33

Manufacturer Defendants procured a benefit from a third party through wrongful conduct and that the State has a better claim to the benefit than Manufacturer Defendants. (*Id*. at 24; *see Gelber*, 935 N.E.2d at 962.)

The Court finds that the State has adequately pled the Manufacturer Defendants procured a benefit through wrongful conduct. The State alleges Manufacturer Defendants "unjustly deceived Illinois diabetics and the State," thereby receiving a "financial windfall" "in the form of amounts paid for diabetes medications and fees and payments collected based on the artificially inflated prices generated by the Insulin Pricing Scheme," "at the expense of the State and Illinois diabetics." (ECF No. 190-50 ¶¶ 493–94.) "The 'unlawful or improper conduct as defined by law,' . . . is fraudulent misrepresentation. Fraudulent conduct consists of a knowing misrepresentation made with the intent to deceive the plaintiff." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.*, Civ. A. No. 05-04742, 2006 WL 3754823, at *4 (N.D. Ill. Dec. 18, 2006) (internal citation omitted) (quoting *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995). As explained *supra* Section III.B.1, the State has met the pleading requirements under Federal Rule of Civil Procedure 9(b). Thus, Manufacturer Defendants' Motion to dismiss the State's claim for unjust enrichment is **DENIED**.

### D. Time-Barred

Finally, Manufacturer Defendants argue both of the State's claims are time-barred because "Illinois indisputably knew well before the five-year limitations period that list prices exclude rebates," and that no tolling doctrine or immunity applies. (ECF No. 190-37 at 25–30.) Manufacturer Defendants contend both of the State's claims are subject to a five-year statute of limitations period (*id*. at 25–26), however, the State asserts there is no statute of limitations on

ICFA claims filed by the State and that the five-year statute of limitations period "does not expressly apply to the State" (ECF No. 190-43 at 24–26.)

Without determining whether any applicable statute of limitations period applies to actions brought by the State, the Court finds that the State's claims under the ICFA and for unjust enrichment are not time-barred.[16] As determined in ECF Nos. 706–07, the date of constructive notice for all plaintiffs in this Insulin multi-district litigation (Dkt. No. 2:23-md-3080) has been determined to be January 14, 2021—the date the Senate Finance Committee released the results and findings of its bipartisan investigation into the rising price of insulin. As this matter was originally filed on December 2, 2022 (Dkt. No. 2:23-cv-04242, ECF No. 1, Ex. A), the State has filed this action within any five-year statute of limitations period. Therefore, Manufacturer Defendants' Motion to Dismiss the State's claims as untimely is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, Manufacturer Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 190-36–37, 190-49) is **DENIED**. An appropriate Order follows.

Date: September 5, 2025                    */s/ Brian R. Martinotti*
                                          **HON. BRIAN R. MARTINOTTI**
                                          **UNITED STATES DISTRICT JUDGE**

---

[16] Though "the statute of limitations for actions arising under the [I]UDTPA and [I]CFA is three years," *Phillips v. WellPoint, Inc.*, 900 F. Supp. 2d 870, 880–81 (S.D. Ill. 2012) (citing 815 ILCS 505/10a(e)), the Court's analysis does not change, as the State filed its Complaint less than two years after the constructive notice date. The statute of limitations for the State's unjust enrichment claim is five years, 735 ILCS 5/13-205; *see also Tartan Constr., LLC v. New Equip. Servs. Corp.*, Civ. A. No. 17-5950, 2018 WL 4563079, at *2 (N.D. Ill. Sept. 24, 2018), meaning both claims are timely.